Pfeifer, J.
We answer the certified questions thusly: (1) No, (2) No, and (3) We decline to answer.

*283
Question 1

“When an insurance company is found by Ohio courts to be guilty of ‘bad faith’ with ‘actual malice’ because it failed to settle a tort case against its insured, does such conduct constitute the type of intentional tort that is uninsurable under Ohio law?”
We find that an insurer found to be guilty of bad faith with actual malice in failing to settle a tort case against its insured is not necessarily guilty of the type of intentional tort that is uninsurable under Ohio law.
Not all intentional torts are uninsurable in Ohio. Ohio law, on public policy grounds, generally prohibits liability insurance from covering damage caused by intentional torts. Gearing v. Nationwide Ins. Co. (1996), 76 Ohio St.3d 34, 38, 665 N.E.2d 1115, 1118; Harasyn v. Normandy Metals, Inc. (1990), 49 Ohio St.3d 173, 176, 551 N.E.2d 962, 965.
But intentional acts sometimes lead to unintentional harms. In Harasyn, this court discussed the different levels of intent involved with intentional acts. “The first level, * * * ‘direct intent,’ is where the actor does something which brings about the exact result desired. In the second, the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result.” Harasyn, 49 Ohio St.3d at 175, 551 N.E.2d at 964. The court concluded that insurance coverage should be prohibited only for direct-intent torts.
In Physicians Ins. Co. of Ohio v. Swanson (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, syllabus, this court held that “[i]n order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended.” In Swanson, the insured fired a BB gun toward a group of children. While he intended to shoot the gun, he did not intend to hit any of the children. This court held that the insurer must provide coverage to the shooter for injuries one of the children suffered.
Thus, an intent to injure, not merely an intentional act, is a necessary element to uninsurability. Whether the insured had the necessary intent to cause injury is a question of fact. Swanson, 58 Ohio St.3d at 193, 569 N.E.2d at 911. In very limited instances, this court has held that the intent to injure can be inferred as a matter of law under certain circumstances. In Preferred Risk Ins. Co. v. Gill (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118, intent to injure was inferred from the defendant’s criminal conviction for aggravated murder, an essential element of which is that the perpetrator intended to cause the death. In Gearing, this court held that the intent to injure could be inferred from the insured’s plea of guilty to charges involving the sexual molestation of minors. *284 The court reasoned that the act and the harm are so intertwined in regard to molestation of children that to intend the act is also to intend the harm.
In both of the above cases, insureds were found to have committed wrongful acts, acts that are intentionally injurious by definition. Here, Buckeye claims to have intended to assert what it believed were its rights under an insurance contract. In certain circumstances, insurers are perfectly right to take such a stand. Murder and molestation do not enjoy similar sometime rectitude, and we therefore will not place failure to settle an insurance claim on their same plane. This court does not infer specific intent to injure from an act of contract interpretation.
Therefore, in this case we apply the normal standard of determining intent to injure, a factual determination relating to this unique case. A jury has already spoken somewhat to Buckeye’s conduct. Our duty is to determine whether the jury found that Buckeye had committed a direct-intent tort. New England argues that the jury expressed that finding in three ways: through the general verdict of bad faith, through its interrogatory answer regarding bad faith, and through its interrogatory answer regarding actual malice. We disagree.
When the Leber II litigation commenced in 1987, the standard for bad-faith failure to settle an insurance claim was that contained in Slater v. Motorists Mut. Ins. Co. (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45. The second paragraph of the syllabus in Slater set forth the standard:
“A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.”
The jury instructions in Leber II contained the above language from the Slater syllabus. However, the instructions also contained language from Hoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, a case that applied a “reasonable justification” standard for bad-faith claims. This court in Hoskins stated that “when an insure[r] insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, ‘ * * * such a belief may not be an arbitrary or capricious one. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefor.’ ” Hoskins at 277, 6 OBR at 341, 452 N.E.2d at 1320. The above Hoskins language also appeared in the jury instruction on bad faith in Leber II.
Intent as a necessary aspect of bad faith is missing from both Hoskins and Slater. As this court stated in Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 554, 644 N.E.2d 397, 399, “the element of intent had been noticeably absent *285 from this court’s definition of when an insurer acts in bad faith” until this court’s decision in Motorists Mut. Ins. Co. v. Said (1992), 63 Ohio St.3d 690, 590 N.E.2d 1228.
While the Slater language in the jury instruction does mention intent, it is not described as a necessary element of bad faith. The Hoskins language is completely void of intent. And in no case is the intent to injure an elemental part of bad faith. Thus we do not determine that the jury found an intent to injure in arriving at its verdict of bad faith.
The Slater language arises again in this case in jury Interrogatory No. 4. The question mimics the Slater language from the jury instruction, and asks:
“Do you find, by a preponderance of the evidence, that the Buckeye Union Insurance Company’s conduct at any time imported a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud or embracing actual intent to mislead or deceive another.”
The jury responded affirmatively to the interrogatory. The jury did not break down all of the listed instances of what might constitute bad faith. The only certainty we can derive from the response is that the jury found that Buckeye’s conduct imported one of the following: (1) a dishonest purpose, (2) moral obliquity, (3) conscious wrongdoing, (4) breach of a known duty through some ulterior motive, or (5) ill will partaking of the nature of fraud or embracing actual intent to mislead or deceive another. While intent may be assumed from any of the five instances of bad faith, only the fifth instance contains an element of intent to injure. For example, this court has stated that conscious wrongdoing “requires the party to possess knowledge of the harm that might be caused by his behavior.” Preston v. Murty (1987), 32 Ohio St.3d 334, 335, 512 N.E.2d 1174, 1176. Knowledge of the harm that might befall another is entirely different from that harm being the motivating factor for one’s behavior. We cannot assume from the jury’s response that it found an intent by Buckeye to injure.
Interrogatory No. 3 is also offered by New England as proof of Buckeye’s direct intent. That interrogatory reads as follows:
“Do you find, by a preponderance of the evidence that the Buckeye Union Insurance Company’s conduct in failing to settle the Leber’s [sic] claims was motivated by actual malice.”
The jury responded “Yes.” Again, we must look to the jury instructions and to case law to determine the significance of that response. The jury was instructed as follows:
“Malice in the law is the intentional or unlawful design to injure another without just cause or proof occasion [sic ]. The term malice not only includes an *286 intentional act, an intent to cause harm, to another party, but also encompasses conduct evidenced by callous and conscious disregard of the rights of another. Actual malice, which is the basis -upon which punitive damages may be awarded, may be inferred from intentional acts which cause injury or damage to another.
“Punitive damages may be awarded in a case involving bad faith claims against insurance companies upon proof of malice, fraud or insult by the insurance company. Malice may also take the form of the defendant’s expressed ill will, hatred or spirit of revenge or from willful or wanton behavior inferred from the conduct and the surrounding circumstances. * * * ” (Emphasis added.)
A key statement in the jury instruction is that “[t]he term malice not only includes an intentional act, an intent to cause harm to another party, but also encompasses conduct evidenced by callous and conscious disregard of the rights of another.” (Emphasis added.) That is an accurate statement of the law in Ohio. The syllabus in Preston holds that malice can be found where there is either conduct “characterized by hatred, ill will or a spirit of revenge, or * * * a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.”
The jury instruction sets forth several bases for a finding of actual malice: (1) callous and conscious disregard for the rights of others, (2) expressed ill will, hatred, or revenge, or (3) willful or wanton behavior. In regard to wanton conduct, this court has held that “[i]t is not necessary that an injury be intended or that there be any ill will on the part of the actor toward the person injured as a result of such conduct.” Tighe v. Diamond (1948), 149 Ohio St. 520, 526, 37 O.O. 243, 246, 80 N.E.2d 122, 126.
Moreover, the instruction stated that malice could be inferred from intentional acts that result in injury. As we have noted above, intentional acts that result in injury are not necessarily direct-intent torts, i.e., torts committed with an intent to injure. Whether there was an intent to injure is the relevant inquiry, and it is an inquiry left unresolved by a finding of malice in this case.
Clearly, the jury’s finding of actual malice was presented within the context of whether Buckeye should be liable for punitive damages. “Actual malice is necessary for an award of punitive damages, but actual malice is not limited to cases where the defendant can be shown to have had an ‘evil mind.’ ” Cabe v. Lunich (1994), 70 Ohio St.3d 598, 601, 640 N.E.2d 159, 162. We find that in deciding that Buckeye acted with actual malice the jury did not necessarily find that Buckeye acted with an “evil mind,” i.e., with an intent to injure.
Since the jury did not specifically find that Buckeye acted with an intent to injure, Buckeye’s bad-faith failure to settle the insurance claim was itself not necessarily an uninsurable act. New England’s attempt to make bad faith and *287 malice equal intent to injure is misplaced and also affects our resolution of the second question posed by the federal court.

Question 2

“Does such a finding of bad faith with actual malice collaterally estop Buckeye from litigating this case?”
We find that the jury’s finding of bad faith with actual malice does not collaterally estop Buckeye from litigating this case. Our reasoning is similar to that in our response to the above question. New England is trying to expand the meaning of bad faith and actual malice to necessarily include the intent to injure.
Due process requires a party asserting collateral estoppel to prove that the identical issue was (1) actually litigated, (2) directly determined, and (3) essential to the judgment handed down in the prior action. Goodson v. McDonough Power Equip., Inc. (1983), 2 Ohio St.3d 193, 201, 2 OBR 732, 739, 443 N.E.2d 978, 985.
The issue to be litigated in this case is whether Buckeye acted with the direct intent to injure. The issue in this case is not whether Buckeye acted in bad faith and with actual malice such that it is liable for punitive damages. Thus, the issues litigated in the two cases are not identical. Certainly then, we cannot conclude that the issue of Buckeye’s intent was directly determined.
Also, the jury’s finding of actual malice was not essential to the prior judgment. The jury’s finding of bad faith was not dependent on a finding of malice. Malice was relevant only toward the issue of punitive damages, which the jury did not award. The jury’s interrogatory response thus became irrelevant in Leber II. It was not a part of the judgment — the judgment against Buckeye would have been the same whether the question had been asked or not.
Thus, we conclude that the jury’s finding of bad faith with actual malice does not estop Buckeye from litigating this case.

Question S

“Under Ohio law does an exclusion in an insurance policy barring coverage for personal dishonesty, fraudulent breach of trust, intention to deceive, or intent to defraud embrace an insurer’s bad faith with actual malice caused by its failure to settle a tort ease?”
We decline to answer the third certified question. It is a question properly resolved at the trial level.

Judgment accordingly.

Moyer, C.J., concurs.
*288 Cook and Lundberg Stratton, JJ., concur in judgment only.
Douglas, Resnick and F.E. Sweeney, JJ., concur in part and dissent in part.